IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION

| | |
|---|---|
| JAMEKA ELEAZER,                §<br>    Plaintiff,             §<br>                                      §<br>v.                                    §<br>                                      §<br>ORACLE AMERICA, INC.,      §<br>    Defendant.            § | CIVIL ACTION NO. 1:24-cv-777-RP |

PLAINTIFF'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

INTRODUCTION

Plaintiff Jameka Eleazer is a Black woman who quickly earned a promotion after getting hired by Oracle in 2019. Things were going well until her manager, Mike Miezo, left the Company in 2022. For a couple months after his departure, Ms. Eleazer was nominally supervised by Area Manager Nicole Levitt, who gave Ms. Eleazer a negative performance review despite having very little information about her work performance.

Then, in June 2022, Garrett Miller took over as her manager. Ms. Eleazer was the only Black employee on Miller's team, and he treated her worse than every other employee on the team from the beginning. He belittled her, demanded evidence for every little thing she told him, micromanaged her, nitpicked and extensively documented her performance of menial data entry tasks, pried into her personal life, and refused to discuss career development or raises with her, none of which he did to any other employee on the team.

This disparate treatment continued when Miller presented Ms. Eleazer with what he titled a "Performance Improvement Plan" in March 2023, the only PIP that he has ever issued. "Performance Improvement Plan" was a misnomer, as the document did not contain any plan. Instead, the document consisted of complaints about Ms. Eleazer's performance that were based

1

on misleading data, along with quotas and goals that Miller acknowledged were unattainable based on the scope of work assigned to Ms. Eleazer.

Ms. Eleazer complained to Defendant's Human Resources Department about the PIP, stating that it was unfair and was the result of illegal discrimination based on race rather than a legitimate reflection of her work performance. Ms. Eleazer provided detailed information showing that the issues raised in the PIP were not caused by poor work performance on her part.

Defendant fired Ms. Eleazer the following month. Knowing that they could not say that they fired her for being Black or complaining about discrimination, Ms. Eleazer's managers manufactured a situation where they could claim that Ms. Eleazer had the lowest sales numbers on her team for a short window of time by firing her mere hours before a substantial deal of hers was set to close. Defendant knew that the closing was imminent and purposely timed the termination in that manner so that it could make this claim about her numbers. From the time that Ms. Eleazer complained to HR, there was never any plan by her managers to improve Ms. Eleazer's performance, despite the title of the PIP document she was presented with. On the contrary, management's sole focus was creating a misleading paper trail to justify a termination.

Defendant's Motion makes the astounding claim, "We couldn't have discriminated based on race because the only other person in this area, where most of the workers are white, that we've disciplined for poor performance is from a different racial minority group." Defendant's Motion also relies heavily on sales metrics, while wholly failing to engage with Ms. Eleazer's claim that those numbers were intentionally manipulated to paint her performance in a false light, much less providing any evidence to rebut those claims. Defendant's Motion also ignores the many other forms of disparate treatment that Ms. Eleazer has identified.

In sum, Defendant's Motion tells Defendant's story about the termination, leaving out context and important facts. The Motion rarely engages with the thrust of Ms. Eleazer's claims and thus does not provide grounds for their dismissal.

## ARGUMENTS AND AUTHORITIES

**I.  There is evidence that Ms. Eleazer was treated worse than employees of other races.**

The first argument in Defendant's Motion asserts that "there is no evidence that Ms. Eleazer was replaced by someone of another race, or that she was treated less favorably than other similarly situated employees of another race." *Def's Motion* at 10. The first part of that sentence is true because, according to Defendant, "there was no direct replacement of Plaintiff's position because there was a reorganization that occurred around the same time Plaintiff was terminated which caused territory re-alignment and Plaintiff's territory to no longer exist." *Exhibit 1*, *Defendant's Responses to Interrogatories*, at 6 (Response to Interrogatory No. 7).

### A.  Ms. Eleazer was the only Black employee on her team and was treated worse than the other team members.

However, there is plenty of evidence that Ms. Eleazer was treated worse than similarly situated employees of other races. She was the only Black employee on the team. *Exhibit 2*, *Excerpts from the Deposition of Garrett Miller*, at 9:25–10:4. Miller and Levitt belittled her; Miller would ask Ms. Eleazer for proof or ask other people to verify basic facts that she told him; Miller changed numbers on her sales deals without telling her; he pestered her about completing work when she was out sick; and he micromanaged her. *Exhibit 3*, *Excerpts from the Deposition of Plaintiff Jameka Eleazer*, at 102:7–103:25, 115:19–118:15, 121:16–122:3, 157:2–159:1. Miller did not act this way toward other employees. *Ex. 3*, at 103:7–22.

3

### B. *Ms. Eleazer was the only employee on her team whose performance was extensively documented.*

Ms. Eleazer is the only employee for which Miller kept a massive spreadsheet of gripes about how and when she performed menial data entry tasks (included as Exhibit A-1 to Defendant's motion). His affidavit falsely claims that he kept such a spreadsheet "as a matter of course for all employees on [his] sales team," *Def's Ex. A*, ¶5, but when we asked for those spreadsheets in discovery, Defendant was forced to admit that they do not exist. *Exhibit 4*, *Defendant's Responses to Second Requests for Production*, at 4 (Response to RFP 24, providing that aside from the duplicate copies of the gripes spreadsheet pertaining to Ms. Eleazer, "Defendant has not identified additional documents responsive to this request following a diligent search.").

### C. *Ms. Eleazer was the only on her team disciplined for performance.*

Ms. Eleazer is the only employee to whom Miller has ever issued a "Performance Improvement Plan." *Ex. 2*, at 103:12–21. The document contains no plan to improve Ms. Eleazer's performance. *Def's Ex. A-2*. Instead, the document consists of complaints about Ms. Eleazer's performance, which are supported by incorrect numbers, and quotas and goals that Miller acknowledged were unattainable based on the scope of work assigned to Ms. Eleazer. *Ex. 3*, at 84:15–23, 86:9–18, 89:9–17, 107:9–108:6; *Def's Ex. A-2*.

### D. *Ms. Eleazer's performance was typical for members of her team.*

Miller singled Ms. Eleazer out to receive a "Performance Improvement Plan" based on inaccurate numbers and unattainable goals even though <u>her performance was typical</u> for members of the team. In contrast to the claim in Defendant's Motion's that "none [of the other team members] had consistently poor performance numbers like Ms. Eleazer," *Def's Motion* at 11, Miller testified in his deposition that he did not remember how she compared to other team members and that such a comparison was not important to him, *Ex. 2*, at 115:3–5, 10–12.

The truth is that during the four quarters that Miller supervised her, Ms. Eleazer ranked **second out of eight** on the team in sales in Quarter 1, *Exhibit 5*, *Q1 Sales Attainment Spreadsheet*; **fourth out of seven** on the team in sales in Quarter 2, *Exhibit 6*, *Q2 Sales Attainment Spreadsheet*; **second out of six** on the team in sales for Quarter 3, *Exhibit 7*, *Q3 Sales Attainment Spreadsheet*; and **sixth out of six** on the team in sales for Quarter 4, *Exhibit 8*, *Q4 Sales Attainment Spreadsheet*. There is a <u>massive asterisk</u> needed for Quarter 4 because Miller fired Ms. Eleazer a few hours before a big deal of hers closed, and thus that sale is not included in her Quarter 4 numbers. *Ex. 2*, at 111:12–16. Although Miller claimed that he was not "100 percent confident" that the deal would close on May 31, he conceded that he knew that Ms. Eleazer closing the deal that afternoon was "a substantial possibility." *Ex. 2*, at 111:17–112:6. If that deal had been included in Ms. Eleazer's Quarter 4 numbers, she would not have been the lowest on the team in sales for Quarter 4; her performance would have continued to be typical for the team. *Ex. 3*, at 172:20–173:1 (noting that the deal was worth over $60,000, which would have moved her from sixth out of six to fourth out of six for Quarter 4); *Ex. 8*.

   E. *Ms. Eleazer was the only employee on her team to have her sales numbers manipulated to support disciplinary action.*

The timing of Ms. Eleazer's firing right before the closing of that deal is the basis for Ms. Eleazer's allegation that "Ms. Eleazer's managers manufactured a situation where they could claim that Ms. Eleazer had the lowest sales numbers on her team for a short window of time by firing her mere hours before a substantial deal of hers was set to close. Defendant knew that the closing was imminent and purposely timed the termination in that manner so that it could make this claim about her numbers." *Plaintiff's Original Petition*, ¶IX. Defendant's Motion does not even mention this allegation, much less attempt to rebut it. Ms. Eleazer's claim of manipulation is supported by Slack messages between the Area Manager and Human Resources representative, only two weeks

5

after Ms. Eleazer was given the "Performance Improvement Plan," in which they scheme about how to find a metric in which they can say that Ms. Eleazer's performance is lowest. *Exhibit 9, Slack messages between Nicole Levitt and Denise Choi*. They later deleted these messages. *Ex. 9*.

Even though Ms. Eleazer's sales performance oscillated between average and slightly above average for the team, she was the only person disciplined for her sales performance. *Ex. 2*, at 103:12–21. Even leaving aside the issue of the deal that she was robbed of credit for, her performance was similar to several other employees on the team: Jim Lamascus ranked **fifth out of eight** on the team in sales in Quarter 1, *Ex. 5*; **first out of seven** on the team in sales in Quarter 2, *Ex. 6*; **sixth out of six** on the team in sales for Quarter 3, *Ex. 7*; and **fourth out of six** on the team in sales for Quarter 4, *Ex. 8*. Amanda Wauters ranked **first out of eight** on the team in sales in Quarter 1, *Ex. 5*; **sixth out of seven** on the team in sales in Quarter 2, *Ex. 6*; **fifth out of six** on the team in sales for Quarter 3, *Ex. 7*; and **third out of six** on the team in sales for Quarter 4, *Ex. 8*. These employees were not disciplined at all, much less terminated for similar sales performance to Ms. Eleazer's.

### F. *Ms. Eleazer was the only employee on her team falsely accused of having field representatives do all her work.*

Miller also claimed that "field teams" were taking the lead on "most, if not all, of" Ms. Eleazer's accounts, *Ex. 2*, at 78:21–24, even though he admitted that he couldn't remember a single time that he observed interactions between a field representative and Ms. Eleazer, *Ex. 2*, at 15:11–22, and even though he admitted that he reviewed a note from the field representative assigned to Ms. Eleazer that contradicted that notion, *Ex. 2*, at 114:8–115:2; *Exhibit 10, Note from Field Representative Hank Bergstresser*. That note informed Miller of the field representative's opinion that Ms. Eleazer's "work effort and account leadership is going unseen"; that Ms. Eleazer "has something that not a lot of early sellers have; the willingness to be coached, take full accountability

6

of a sales cycle, and the ability to move deals forward"; that Ms. Eleazer was "was instrumental in assisting with account planning, research, and whitespacing activities in the territory while also executing on campaigns to find new business opportunities"; and that Ms. Eleazer "has managed to still connect and even sell to . . . tough clients to navigate." *Ex. 10*.

These sentiments were echoed by another field representative who worked with Ms. Eleazer. That field representative told Miller that Ms. Eleazer was "a true asset" who was "educated in internal tools," was "dependable and incredibly hard-working," and was "an impressive Applications Sales Representative, who is always working to educate our clients." *Exhibit 11*, *Note from Field Representative Greg Rothmeyer*. The field representative asked Miller not to place Ms. Eleazer on a Performance Improvement Plan, saying, "I would dislike losing Jameka as a sales resource. I turn to her often for suggestions and input. She helps elicit responses from the POC's with my accounts and has gathered critical information where others have not had success . . . ." *Ex. 11*.

Miller's claim that Ms. Eleazer was allowing the field representatives to do all the work, which is contradicted by the field representatives and is not supported by any facts, is one of the key pillars (aside from the manipulated numbers) that he uses to justify her firing. *Def's Ex. A*, ¶¶6, 7, 12. There is no evidence in the record that Miller actively distorted the role of field representatives in the sales made by others on his team, which is another example of disparate treatment.

### G. **Defendant admits that it only disciplines non-white employees for performance.**

Defendant makes the incredible argument that it did not racially discriminate against Ms. Eleazer because the only other person disciplined for performance reasons in this area was another person belonging to a racial minority group. *Def.'s Motion* at 13–14. In Defendant's Austin office

at the time of the events in question, most sales workers were white. *Exhibit 12*, *Defendant's 2023 EEO-1 Report* (showing that 1,013 of the 1,623 sales workers in 2023 were white). It is confusing that Defendant believes that under these circumstances, only disciplining people of color is evidence <u>rebutting</u> an allegation of race discrimination. Ms. Eleazer submits that the other employee's case is instructive for different reasons.

Like Ms. Eleazer, the other employee was given a "Performance Improvement Plan" that contained no plan to improve her performance. *Def's Ex. B-3*. Just as with Ms. Eleazer, the manager, area manager, and HR representative looked for a metric they could manipulate to say that the other employee was the lowest on the team in that metric. *Exhibit 13*, *E-mail string with other employee's manager, area manager, and HR*. And just as with Ms. Eleazer, Defendant makes the unverifiable claim that one of the other employee's big deals was "a field led deal," implying that she should get less credit for it, without acknowledging the role of field representatives in sales made by other members of the team. *Def.'s Motion* at 13–14. Oracle characterizes this as two employees "exhibiting nearly identical performance deficiencies," *Def.'s Motion* at 14, but a jury could easily see it as Oracle's playbook for terminating minority employees while never taking action against any white employees regardless of their performance. That is another fact question that precludes summary judgment.

Ms. Eleazer has presented more than enough evidence to establish a prima facie case of discrimination, or at least to show that fact issues exist on each element. The Court should deny this portion of Defendant's Motion.

**II.     There is evidence of pretext.**

Defendant's second argument asserts that Ms. Eleazer has no evidence that Oracle's stated reason for her termination is a pretext "and instead simply attempts to argue that she should have

8

been held to different quotas and metrics than all of the other ASRs on her team." *Def.'s Motion* at 14–18. Defendant's stated reason for the termination is Ms. Eleazer's "unsatisfactory performance." *Def.'s Motion* at 15.

Ms. Eleazer has ample evidence that the stated reason is a pretext, which has been discussed above. This evidence includes the following facts: (1) Ms. Eleazer's performance was typical of members of her sales team. (2) Miller manipulated her sales numbers by firing her before a large deal was set to close so that her performance would look worse than it really was. (3) Miller claimed that she had field representatives doing all her work, consistent with the stereotype of Black people as "lazy," *see, e.g.*, *Butler v. Coca-Cola Co.*, No. 1:19-CV-03847-AT-AJB, 2021 WL 11707646, at *20 (N.D. Ga. Aug. 3, 2021), *report and recommendation adopted*, No. 1:19-CV-3847-AT, 2021 WL 11707651 (N.D. Ga. Aug. 25, 2021) (noting "highly offensive stereotypes of black people, including them being called lazy"), even though he had no information to support that position and had been told by the field representatives that it is inaccurate. (4) Defendant's Austin sales team had a pattern of manufacturing performance allegations to fire employees in racial minority groups.

This evidence is more than sufficient for a reasonable jury to find that Defendant's stated reason for termination was a pretext for illegal discrimination. Accordingly, the Court should deny this portion of Defendant's Motion.

### III. Ms. Eleazer exhausted her administrative remedies on her retaliation claims.

Defendant next urges that Ms. Eleazer "failed to exhaust her administrative remedies by not including a retaliation claim in her EEOC Charge." *Def.'s Motion* at 18. Although Defendant acknowledges that the determination of which claims have been exhausted is based on "the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination,"

because "the civil action is much more intimately related to the EEOC investigation than to the words of the charge which originally triggered the investigation," *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 465–66 (5th Cir. 1970), Defendant nevertheless focuses exclusively on the words of the charge and does not even make any arguments about the scope of the investigation that could reasonably be expected. *Def.'s Motion* at 18–20.

In making this misguidedly charge-focused exhaustion argument, Defendant ignores the fact that in her initial contact with the EEOC, Ms. Eleazer noted that one of her complaints was "Retaliation – I complained to my employer about job discrimination," and she alleged that "I was wrongfully terminated on 5/31/23 after informing HR about my manager trying to put me on a performance plan without any prior knowledge or warning of performance issues, that was based on his discriminatory biases rather than actual performance." *Exhibit 14*, *EEOC Inquiry*. An EEOC investigation that began with an inquiry using those words should reasonably be expected to look into the retaliation allegations. At the very least, there is a fact question precluding summary judgment on that issue. *See, e.g.*, *Begolli v. Home Depot U.S.A., Inc.*, 701 F.3d 1158, 1159–61 (7th Cir. 2012) (noting that fact questions on administrative exhaustion in Title VII cases should be resolved by juries).

## CONCLUSION AND PRAYER FOR RELIEF

There are fact questions on every issue raised by Defendant's motion. As such, it should be denied in its entirety.

*Respectfully submitted,*

DEATS DURST & OWEN, PLLC

      /s/ Matt Bachop
Matt Bachop
TBN: 24055127
mbachop@ddollaw.com
8140 N Mopac Expy, Suite 4-250
Austin, Texas 78759
(512) 474-6200
FAX (512) 474-7896

Attorney for Plaintiff

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document has been served on counsel for Defendant, Edward M. "Ted" Smith, tsmith@cornellsmith.com, and Sarah E. Lancaster, slancaster@cornellsmith.com, CORNELL SMITH MIERL BRUTOCAO BURTON, LLP, 1607 West Avenue, Austin, Texas 78701, Telecopy: (512) 328-1541, by the Court's CM/ECF system on this 6th day of August, 2025.

      /s/ Matt Bachop
      Matt Bachop