**EXHIBIT**

**3**



WWW.TLC-TEXAS.COM | 855.327.7901

1

```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
                      AUSTIN DIVISION

JAMEKA ELEAZER,              )
Plaintiff                    )
                             )
vs.                          ) CASE NO. 1:24-cv-00777-DII
                             )
ORACLE AMERICA, INC.,        )
Defendant                    )
```


                    ORAL VIDEOTAPED DEPOSITION

                          JAMEKA ELEAZER

                        January 16, 2025



    ORAL VIDEOTAPED DEPOSITION OF JAMEKA ELEAZER,

produced as a witness at the instance of the Defendant

and duly sworn, was taken in the above-styled and

numbered cause on the 16th day of January, 2025, from

10:11 a.m. to 3:04 p.m., before Chloe Salazar, Certified

Shorthand Reporter in and for the State of Texas,

reported by computerized stenotype machine at the

offices of Deats Durst & Owen, PLLC, 8140 N. MoPac

Expressway, Suite 4-250, Austin, Texas  78759, pursuant

to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached hereto.

2

```
 1                         APPEARANCES

 2

 3  FOR PLAINTIFF:

 4        Mr. Matt Bachop
          DEATS DURST & OWEN, PLLC
 5        8140 N. MoPac Expressway
          Suite 4-250
 6        Austin, Texas  78759
          Telephone: (512) 474-6200
 7        E-mail: mbachop@ddollaw.com

 8  FOR DEFENDANT:

 9        Mr. Edward "Ted" Smith
          CORNELL SMITH MIERL BRUTOCAO BURTON, LLP
10        1607 West Avenue
          Austin, Texas  78701
11        Telephone: (512) 328-1540
          E-mail: tsmith@cornellsmith.com
12
              - and -
13
          Ms. Jennifer Cotner
14        ORACLE IN-HOUSE ATTORNEY

15  ALSO PRESENT:

16        Mr. Timothy Desadier (Videographer)
          Mr. Jack Queralt
17

18

19

20

21

22

23

24

25
```

84

15      Q.    And for your quarterly KPIs for FY23, so for

16 the entire year of 2023, your average calls per week --

17 Q3 were 56; Q2, 79; Q1, 34; is that right?

18      A.    No.

19      Q.    Those numbers are incorrect?

20      A.    Yes.

21      Q.    Why are those numbers incorrect?

22      A.    Because the tool that Garrett got this from is

23 not accurate.

 9    Q.   In fact, Ms. Eleazer, sitting here today, you

10 don't -- you don't know for certain what tool he used to

11 pull from these numbers, right?

12    A.   I don't, but I know when I pulled my averages

13 from ISR, they were completely different.

14    Q.   Do you have any documentation showing the

15 numbers from the ISR that you pulled at that time?

16    A.   Yes.

17    Q.   Where is that?

18    A.   I sent it to y'all.

89

 9     Q.    Did you look at the new tool when you were

10 determining what your numbers were?

11     A.    I had glanced at it a few times, but we had

12 stopped using that tool because at some point, you know,

13 our whole team knew that the tool -- we talked about it

14 on a call once.  When it's, like, "Hey, that tool

15 doesn't accurately report my -- my calls," and so

16 Garrett's like, "Hey, just use ISR then."  But multiple

17 team members complained about that tool.

102

 7      Q.    What -- how did he show you that you -- he
 8 didn't like you, in your opinion?
 9      A.    I mean, Garrett was, like, super micromanager
10 over me.  He would pester me about things after hours.
11 He would go in and change things on my deals without my
12 permission.  He would lower my opportunities without my
13 knowledge or permission.  He would ask me things that I
14 didn't -- that he didn't ask other employees, like,
15 "When are you flying?  Send me your flight information."
16      Q.    How do you know he didn't ask other employees
17 questions like that?
18      A.    Because I asked them.
19      Q.    All of them?
20      A.    I've asked the people I was close to on the
21 team, like, "Does Garrett ever ask you, you know, for
22 your flight details?" you know.
23              He pestered me about a deal when I was
24 out sick with COVID.  He would, you know, talk to me as
25 if he didn't believe me.  He'd be, like, "Did you

1 really, you know, talk to so-and-so?"  Basically, "Do

2 you have evidence of that?  Can you send it over?"

3                    He had, in my opinion, went behind my

4 back to one of the ISEs (phonetic) and asked if I had

5 really had a call or set up something with a customer.

6      Q.   Which ISE was that?

7      A.   Brandon.  His name was Brandon.  I don't

8 remember his last name, but I worked on Rouse's with

9 him.

10                   THE REPORTER:  Worked on what?  I'm

11 sorry.

12                   THE WITNESS:  The account was Rouse's

13 Enterprises, or Rouse's.

14      A.   Hank and I shared that account.  And when

15 Hank, myself, and Brandon were talking, Brandon had said

16 that, "Oh, well, Garrett already asked me, 'Did we

17 discuss this?' and I told him, 'Yeah.'"

18                   And I was like, That's interesting.  Why

19 would -- why did Garrett, like, go ask him about

20 something that I already told him had happened?  But he

21 went to go double-check with Brandon to make sure that

22 conversation indeed happened.

23                   There was a lot of other instances that I

24 think I documented.  I can't remember all of them,

25 but --

19    Q.    Okay.  And then you write in here, it says,

20  "He Slacked me Monday 2/27 asking for an update, which I

21  replied, 'I had no updates and that I was still out

22  sick.'"

23              Do you think it was unprofessional for

24  him to check on you on that Monday, February 27th?

25    A.    Check on me or ask me about an update on a

1 deal -- he asked me about an update on a deal that I was

2 closing.  He wasn't checking on me.  He said, "What's

3 the update with AWG" -- or -- I think it was AWG.

4     Q.   Do you put that in there?  It just says

5 "update," right?

6     A.   I had this call with Nicole and Denise, and

7 I -- when I went through this, I -- we talked in full

8 about it.  So these are here as I walk through with my

9 call, so I probably discussed in full on the call.

10     Q.   So in here you say, "He Slacked me Monday 2/27

11 asking for an update, which I replied, 'I had no updates

12 and I was still out sick.'

13            "He then said, 'Oh, I thought you'd be

14 feeling much better with the weekend going by.'"

15            You then say, "This response was

16 completely unprofessional, unethical, and lacked

17 compassion and empathy since I in fact had the flu."

18            What was unprofessional, unethical, or

19 lacking compassion or empathy about the statement, "Oh,

20 I thought you'd be feeling much better with the weekend

21 going by"?

22     A.   I feel like Garrett was being sarcastic just

23 because of my previous interactions with him, my live

24 previous interactions with him, just his tone.  So when

25 he was saying this in a Slack, I felt like it was

117

1 sarcasm, plus, he had known that I had given him a

2 doctor's note, like -- and that I was going to

3 continuously be out and that he shouldn't be Slacking me

4 about, "Oh, just because it's the weekend, you're

5 supposed to be feeling better all of the sudden."  Like,

6 what does that mean?  Because it's Friday, Saturday,

7 Sunday, I -- I'm all the sudden not sick anymore?  So it

8 felt a bit unethical, and it felt like it lacked

9 compassion because he assumed that I was just supposed

10 to be better.

11      Q.   And when you say he Slacked you this, this was

12 written, not verbal, right?

13      A.   It was on a Slack, I believe, yeah.

14      Q.   So where are you getting the impression that

15 this was sarcastic?

16      A.   Just from my interactions with him live.

17 Like, I just -- you -- someone's tone is -- that's how

18 you hear it.  If someone talks to you a certain way

19 often, you know, you -- or they -- that's just what it

20 felt like.

21      Q.   "I then responded saying, 'The flu didn't just

22 go away because the weekend went by.  I'm still sick.'"

23           That's what you wrote back?

24      A.   Yeah.

25      Q.   To your manager?

118

1     A.   Yes.

2     Q.   And then you said, "He then seemed upset and

3 responded, 'Well, you didn't tell me you'd still be out

4 sick and you need to notify me each day you will not be

5 [sic] out sick.'"

6                    You say, "Again, this response lacked

7 professionalism, was unethical, rude, he was prying.  He

8 responded as if my uncontrollable sickness was a

9 personal attack to him as my manager (a form of White

10 supremacy)."

11                    Again, this -- the only written statement

12 that you're basing this on is what you wrote here,

13 right:  "Well, you didn't tell me you'd still be out

14 sick, and you need to notify me each day you will be not

15 out sick"?

121

16     Q.   On the next page, Eleazer0310, you say, "Being
17 shady/sneaky."  What do you mean by that?
18     A.   Oh, I meant when he went behind my back to
19 speak to Brandon at the time.  I felt it was pretty
20 shady when I had already told you what happened, that
21 you went to go double-check to make sure it was true.
22               And then changing my deals without my
23 permission, going in and changing the amounts of my
24 deals without my permission -- or without my knowledge
25 or my AE's -- my ASE's knowledge, which they're on the

1 deal, as well.  He was going in and changing the amounts

2 and never notifying me.  And, you know, I would just be

3 like, Why did the amount change, you know?

157

2     Q.    So if you could turn to Page 2 at the bottom,

3  the actual page -- numbered Page 2.

4              You state in here, "Mr. Miller treated

5  Ms. Eleazer worse than he treated the non-Black

6  employees he supervised.  By way of example, Mr. Miller

7  would belittle Ms. Eleazer, asking her things like, 'Do

8  you understand?' or, 'Do you feel competent enough to

9  complete this task?'"

10             Were there any witnesses to these

11 comments that you're alleging?

12    A.    He might have asked this on the call with

13 Nicole and Denise, but Nicole definitely said this to me

14 before.

15    Q.    Nicole said which of these statements to you

16 before?

17    A.    "Do you understand?  Do you feel competent to

18 complete this task?"

19    Q.    Nicole said that to you or Mr. Miller said

20 that to you?

21    A.    They both have, but Nicole -- I just -- I

22 believe they both addressed it on one of the live calls

23 with Denise Choi, like, "There were times I was

24 concerned about her competency."

25             But Nicole literally asked, "Do you feel

158

1 competent enough to do something?  Do you understand

2 what you're supposed to be doing?"

3      Q.    And you felt that was belittling you?

4      A.    Yes.

5      Q.    Why?

6      A.    Because I knew what I was doing.  And I had

7 done something in the system and I thought I submitted

8 something in the system and it just didn't submit.  I

9 guess I just didn't press "Submit" or something.

10              And so when she came back to me, she was

11 like, "What happened?"

12              I was like, "Oh, I thought I submitted

13 it."

14              And she was like, "Oh, are you not

15 competent?  Do you feel like you're competent enough to

16 work the system?"

17              And I was like, "Yeah.  I just told you

18 I -- I just didn't submit it.  I thought I submitted it.

19 Like, I thought I pressed 'Submit.'  Maybe the screen

20 didn't load."  It just was -- yeah, it felt like a

21 little bit of an attack.

22      Q.    And I just want to be clear.  You're saying

23 that these statements were made by both Nicole Levitt

24 and Garrett Miller?

25      A.    For sure Nicole, and Garrett asked in his own

159

1 ways at times, yes.

```
20      Q.   What was the deal that closed on the day of

21 your termination?

22      A.   It was an American Eagle deal.

23      Q.   Another American Eagle deal?

24      A.   Yes.

25      Q.   Do you know what that deal was worth?
```

173

1        A.    It was in the 60Ks, I believe, for the annual.

182

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
 2                      AUSTIN DIVISION

 3 JAMEKA ELEAZER,            )
   Plaintiff                  )
 4                            )
   vs.                        ) CASE NO. 1:24-cv-00777-DII
 5                            )
   ORACLE AMERICA, INC.,      )
 6 Defendant                  )

 7

 8                  REPORTER'S CERTIFICATE

 9      ORAL VIDEOTAPED DEPOSITION OF JAMEKA ELEAZER

10                    January 16, 2025

11

12     I, the undersigned certified shorthand reporter in

13 and for the State of Texas, certify that the facts

14 stated in the foregoing pages are true and correct.

15     I further certify that I am neither attorney or

16 counsel for, related to, nor employed by any parties to

17 the action in which this testimony was taken and,

18 further, that I am not a relative or employee of any

19 counsel employed by the parties hereto or financially

20 interested in the action.

21     $_____ is the deposition officer's charges to

22 the Defendant for preparing the original deposition and

23 any copies of exhibits;

24     That pursuant to information given to the deposition

25 officer at the time said testimony was taken, the
```

183

1 following includes all parties of record and the amount

2 of time used by each party at the time of the

3 deposition;

4      Mr. Matt Bachop (0h00m)
            Attorney for Plaintiff
5      Mr. Edward "Ted" Smith (3h49m)
            Attorney for Defendant
6


7


8      SUBSCRIBED AND SWORN TO under my hand and seal of

9 office on this 29th day of January, 2025.

10

11 _____

12                              Chloe Salazar, CSR
                                Texas CSR 9473
13                              Expiration:  5/31/26
                                Firm Registration No. 656
14                              THE LEGAL CONNECTION
                                8656 W Hwy 71, Suite F-200
15                              Austin, Texas  78735
                                P: (512) 892-5700
16                              F: (512) 892-5703

17

18

19

20

21

22

23

24

25