IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JAMEKA ELEAZER, | § § § § § § § § § § | |
| Plaintiff, | | |
| v. | | 1:24-CV-777-RP |
| ORACLE AMERICA, INC., | | |
| Defendant. | | |

**ORDER**

Before the Court is Defendant Oracle America, Inc.'s ("Oracle") Motion for Summary Judgment, (Dkt. 14), and all responsive briefing (Dkts. 15, 16). Having considered the parties' submissions, the record, and the applicable law, the Court will grant the motion.

**I. BACKGROUND**

Plaintiff Jameka Eleazer ("Eleazer") brought this case under Title VII of the Civil Rights Act of 1964 ("Title VII") and Chapter 21 of the Texas Labor Code, the Texas Commission on Human Rights Act, ("Chapter 21") concerning Oracle's decision to terminate her on June 1, 2023. Eleazer filed the instant suit in state court on June 12, 2024, claiming that Oracle discriminated against her because she is Black. Oracle removed the case to this Court on July 11, 2024.

**A. Eleazer's Employment at Oracle**

In February 2019, Eleazer, a Black woman, began her employment at Oracle as a Business Development Consultant ("BDC"), an entry-level sales position at Oracle that "does not have responsibility for booking or closing any actual sales." (Levitt Dec., Dkt. 14-3, at ¶ 2; Miller Dec., Dkt. 14-2, at ¶ 2; Eleazer Dep., Dkt. 14-5, at 26:11–14). Rather, a BDC uncovers leads or opportunities to then pass them along to Oracle sales team members. (Miller Dec., Dkt. 14-2, at ¶ 2). In July 2020, Eleazer was promoted to an Application Sales Representative ("ASR"), and her

1

responsibilities shifted to "working with existing Oracle clients to sell them expansions to the existing products that they have already purchased, as well as selling them new Oracle products." (Miller Dec., Dkt. 14-2, at ¶ 3; Eleazer Dep., Dkt. 14-5, at 27:2–13). Oracle expects ASRs—unlike BDCs—to meet set quarterly sales attainment and pipeline generation goals (or, "quotas") as well as "certain Key Performance Indicators ('KPIs') showing their engagement in activities to assist in generating sales and sales pipeline, including: making telephone calls, sending emails, scheduling and participating in meetings, and presenting product demonstrations." (Levitt Dec., Dkt. 14-3, at ¶ 3; Miller Dec., Dkt. 14-2, at ¶ 3).

As an ASR, Eleazer initially reported to Mike Miezo ("Miezo"). (Levitt Dec., Dkt. 14-3, at ¶ 3; Eleazer Dep., Dkt. 14-5, at 94:24–95:8). After Miezo left Oracle in 2022, Nicole Levitt ("Levitt"), Eleazer's Area Manager, became Eleazer's direct manager for the remainder of Oracle's 2022 fiscal year, (Levitt Dec., Dkt. 14-3, at ¶ 3, 5; Eleazer Dep., Dkt. 14-5, at 95:3-8), which runs from June 1 to May 31, (Miller Dec., Dkt. 14-2, at ¶ 4). Therefore, Levitt submitted Eleazer's performance review for Fiscal Year 2022. (Levitt Dec., Dkt. 14-3, at ¶ 3; *id.* at 6–11).

In Levitt's review of Eleazer, Levitt gave Eleazer a rating of "Needs improvement" in the categories Levitt ranked Eleazer, including "Overall Summary, "Performance Goals," and "Competencies." (Levitt Dec., Dkt. 14-3, at 6–8). In her review, Levitt reported that Eleazer met 62% of her annual sales attainment quota in Fiscal Year 2022 and commented that "[w]hile [Eleazer] did have a deal close each quarter in FY22, the opportunity for her in the new FY will be around taking a more proactive approach to engagement and developing a compelling event that may not already exist." (*Id.* at 6). In the "Performance Goals" category of the review, Levitt stated "[Eleazer] understands that lack of urgency and reactiveness rather than proactiveness resulted in deals being left on the table in FY22." (*Id.* at 8). Eleazer ranked herself as "Exceeds expectations" in the categories in which Levitt gave her a ranking of "Needs improvement." (Levitt Dec., Dkt. 14-3, at

2

6–8). Eleazer highlighted the "leg work" she accomplished in Fiscal Year 2022 and stated that although she "did not meet 100% of [her] quote, [she] fostered great relationships with the internal Oracle Teams and the Customer teams to create trust and community." (*Id.* at 8).

In June 2022, Garrett Miller ("Miller") assumed responsibility as Eleazer's direct manager, and Levitt resumed her role as Area Sales Manager, and Eleazer's second-level manager. (Miller Dec., Dkt. 14-2, at ¶ 1; Levitt Dec., Dkt. 14-3, at ¶ 5; Eleazer Dep., Dkt. 14-5, at 30:3–10, 63:11–14). Miller documented Eleazer's "performance deficiencies" he perceived as her manager in a Performance Management Log, which Miller maintains that he regularly used for all employees he supervised. (Miller Dec., Dkt. 14-2, at ¶ 5; *id.* at 9). Miller "noticed that [Eleazer] seemed to lack a sense of urgency as she regularly missed various deadlines and failed to complete tasks in a timely manner." (*Id.* at ¶ 5). Miller also observed that "Eleazer lacked the ability to drive her own sales without relying on significant assistance from either [himself] or her assigned field team." (*Id.* at ¶ 6). Eleazer contends that Miller and Levitt "belittled her," Miller was a "super micromanager over [her]," and that Miller treated her differently than his other supervisees. (Resp., Dkt. 15, at 3; Eleazer Dep., Dkt. 15-3, at 102:9–10).

In the fall of 2022, Miller consulted with Levitt and Denise Choi ("Choi"), the designated Human Resources Business Partner for Miller's Sales Area, to "seek their advice and counsel as to how best address Ms. Eleazer'[s] performance issues." (Miller Dec., Dkt. 14-2, at ¶ 9; Levitt Dec., Dkt. 14-3, at ¶ 7; Choi Dec., Dkt. 14-4, at ¶ 3). Thereafter, Miller conducted weekly "performance sync" meetings with Eleazer "in an attempt to help her improve her performance." (Miller Dec., Dkt. 14-2, at ¶ 9). Miller did not believe that Eleazer was satisfactorily improving her performance, so he again consulted with Levitt and Choi, who agreed together to institute a Performance Improvement Plan ("PIP") for Eleazer. (*Id.*). This was the first time Miller issued a PIP. (Resp., Dkt. 15-2, at 103:12–21).

3

**B. Eleazer's Termination from Oracle**

On March 29, 2023, Miller had a discussion with Eleazer and placed her on a PIP. (Miller Dec., Dkt. 14-2, at ¶ 10; *id.* at 23). The PIP listed Miller's concerns with Eleazer's performance as an ASR including "[l]ack of overall attainment," "[p]ipeline and forecasting issues," "[l]ack of activities," and "[l]ack of urgency to complete day-to-day tasks and assigned action items." (*Id.*). Miller cited Eleazer's performance metrics and examples of Eleazer's conduct. (*Id.*). Eleazer maintains that the numbers cited for her "average calls per week" are incorrect. (Resp., Dkt. 15, at 4; Eleazer Dep., Dkt. 15-3, at 84:15–23). Oracle sets certain sales attainment and pipeline generation goals for its ASRs, which Miller referenced in Eleazer's PIP. (Miller Dec., Dkt. 14-2, at ¶ 3; *id.* at 23). Eleazer achieved the following percentages of those goals upon completion of Fiscal Year 2023:

- Quarter 1: Sales Attainment – 154%; Sales Pipeline Generation – 22%
- Quarter 2: Sales Attainment – 12%; Sales Pipeline Generation – 20%
- Quarter 3: Sales Attainment – 49%; Sales Pipeline Generation – 28%
- Quarter 4: Sales Attainment – 0%;[1] Sales Pipeline Generation – 26%

(*Id.* at ¶ 14). In Eleazer's PIP, Miller stated, "[w]hile your attainment in Q1FY23 reflects 154%, the vast majority of your attainment was a field driven deal." (Miller Dec., Dkt. 14-2, at 23).

Miller warned at the conclusion of Eleazer's PIP, "[w]hile we have discussed these concerns previously, you have yet to make any improvement" and that "it is critical that you take responsibility for these issues and make immediate and sustained improvement to your overall

---

[1] Eleazer contends that her sales attainment quota percentage for the fourth quarter of Fiscal Year 2023 (0%) was intentionally manipulated because Oracle knowingly fired her "mere hours before a substantial deal of hers was set to close." (Resp., Dkt. 15, at 2). Miller confirmed that he was aware it was a "substantial possibility" that Eleazer's deal would close that afternoon. (Resp., Dkt. 15-2, at 111:17–112:6). Miller also stated that the deal would not have been significant enough to change Oracle's determination that termination was the "correct next step" or "show really significant enough improvement towards her achieving her quota for the quarter or the year to make a difference." (Reply, Dkt. 16-1, at 112:12–113:7).

performance . . . [f]ailure to do so will lead to further corrective action, up to and including termination of your employment." (*Id.*). In the email Miller sent Eleazer after their conversation attaching the PIP, Miller confirmed that he would continue their "weekly performance meetings and regular 1x1s." (Choi Dec., Dkt. 14-4, at 7).

On April 3, 2023, Eleazer contacted Choi to state her belief that the PIP was unfair and "less about the reflection of my performance and rather more about personal reasons." (Choi Dec., Dkt. 14-4, at 6). Eleazer explained that she told Miller she did not agree with the PIP, "given the data was highly inaccurate." (*Id.*). Eleazer also described how she requested to speak with Choi upon receiving the PIP from Miller, but that Miller had not reported back whether he had relayed that request to Choi. (*Id.*). In her message to Choi, Eleazer requested that they met to "discuss [her] concerns and need to transfer to another team." (*Id.*). The next day, Choi invited Eleazer to set up time on Choi's calendar to connect. (*Id.*). Two days later, Eleazer and Choi met to discuss these concerns, and during the following week Eleazer met with both Choi and Levitt. (Levitt Dec., Dkt. 14-3, at ¶ 8; Choi Dec., Dkt. 14-4, at ¶ 5; Eleazer Dep., Dkt. 14-5, at 135:7–18, 136:22–24). Eleazer prepared a response to the PIP, which she gave to Choi at their meeting on April 5, 2023. (Choi Dec., Dkt. 14-4, at ¶ 5). Choi "determined that Ms. Eleazer had not identified anything improper with either the PIP, or how Mr. Miller had tried to address Ms. Eleazer's performance issues" and that "both the PIP and Mr. Miller's actions were consistent with Oracle's processes and expectations in handling such performance issues." (*Id.*).

Miller, Levitt, and Choi exchanged emails and held discussions with Eleazer over the next several weeks concerning the PIP and Eleazer's progress addressing their concerns. (Miller Dec., Dkt. 14-2, at ¶ 11; Levitt Dec., Dkt. 14-3, at ¶ 9; Choi Dec., Dkt. 14-4, at ¶ 6). On May 4, 2023, after a meeting between Miller, Levitt, Choi, and Eleazer two days prior, Levitt sent Eleazer an email summarizing that meeting in which she stated that although they had seen Eleazer make some

5

additional efforts toward the performance deficiencies identified in the PIP, "even with these efforts, there is still a significant gap between where you are currently and what is expected form an ASR in this role and level of tenure." (Levitt Dec., Dkt. 14-3, at 14). Eleazer responded to that message on May 17, 2023 providing responses to each of the concerns Levitt outlined in her original message and requesting that a "specific 'plan'" be set regarding those concerns. (*Id.* at 13–16). In the May 4, 2023 email, Levitt also wrote that Miller would continue to meet with Eleazer to discuss her progress against the PIP. (*Id.* at 16). Throughout the remainder of Fiscal Year 2023, Miller asserts that he observed Eleazer "was merely 'checking boxes' and doing 'busy work' more akin to the entry level position of Business Development Consultant that she previously held at Oracle rather than focusing on activities that could result in sales revenue or pipeline creation as required of all ASR's." (Miller Dec., Dkt. 14-2, at ¶ 12).

Oracle contends that "[a]s a result of these failures to show sufficient improvement in her performance, the determination was made by Mr. Miller and Ms. Levitt, in consultation with Ms. Choi, to move forward with terminating Ms. Eleazer's employment." (Miller Dec., Dkt. 14-2, at ¶ 12; Levitt Dec., Dkt. 14-3, at ¶ 11; Choi Dec., Dkt. 14-4, at ¶ 7). As such, Eleazer was terminated from her employment at Oracle effective June 1, 2023. (Miller Dec., Dkt. 14-2, at ¶ 13; Levitt Dec., Dkt. 14-3, at ¶ 12).

### C. The Claims

Eleazer brings claims under Title VII and Chapter 21 for discrimination and retaliation. Oracle asserts that Eleazer has not established a prima facie case of discrimination and that even if she could, Eleazer was terminated for a legitimate, non-discriminatory reason. Oracle also asserts that Eleazer failed to exhaust her administrative remedies under Title VII and Chapter 21 for her retaliation claims. Oracle seeks summary judgment on all of Eleazer's claims.

## II. LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotations and footnote omitted). When reviewing a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Further, a court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). "[A Title VII] plaintiff's subjective belief, alone, is insufficient to establish a claim of discrimination." *Moreno v. Brownlee*, 85 F. App'x 23, 26 (5th Cir. 2004).

Furthermore, the nonmovant is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for

summary judgment. *Id.* After the nonmovant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. *Miss. River Basin All. v. Westphal,* 230 F.3d 170, 175 (5th Cir. 2000).

### III. DISCUSSION

### A. Title VII/Chapter 21 Discrimination

Eleazer brings her race discrimination claims against Oracle under Title VII and Chapter 21. (Pl.'s Original Pet., Dkt. 1, at 4–5). Title VII, as amended, 42 U.S.C. § 2000e *et seq.*, prohibits an employer from "discharg[ing] any individual, or [discriminating] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(l). Chapter 21 prohibits an employer from "discharg[ing] an individual, or discriminat[ing] in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment" "because of race . . . ." Tex. Labor Code Ann. § 21.051. The Fifth Circuit has held that the substantive law governing claims under Chapter 21 and Title VII is "identical." *Gorman v. Verizon Wireless Tex., L.L.C.*, 753 F.3d 165, 170 (5th Cir. 2014); *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 n.2 (5th Cir. 1999). As such, the Court analyzes these claims together.

To survive summary judgment, a Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion, which may be established via direct or circumstantial evidence. *Harris v. Drax Biomass Inc.*, 813 F. App'x 945, 947 (5th Cir. 2020) (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 (1977)). Because Eleazer attempts to prove race-based discrimination under Title VII through circumstantial evidence, the Court must evaluate her claims under the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as modified by the Fifth Circuit. *Paske v. Fitzgerald*, 785 F.3d 977, 984 (5th Cir. 2015).

8

"Under the modified *McDonnell Douglas* approach, the plaintiff must first demonstrate a prima facie case of discrimination, or disparate treatment; the defendant then must articulate a legitimate, non-discriminatory reason for its decision to terminate the plaintiff; and, if the defendant meets its burden of production, the plaintiff must then offer sufficient evidence to create a genuine issue of material fact that either (1) the employer's reason is a pretext or (2) that the employer's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic." *Burrell v. Dr. Pepper/Seven U3p Bottling Grp., Inc.*, 482 F.3d 408, 411–12 (5th Cir. 2007). To establish a prima facie case of discrimination or disparate treatment, Eleazer must show that she "(1) is a member of a protected class; (2) was qualified for the position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside of the protected class, or, in the case of disparate treatment, shows that other similarly situated employees were treated more favorably." *Standley v. Rogers*, 680 F. App'x 326, 327 (5th Cir. 2017) (quoting *Bryan v. McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir. 2004)).

Oracle contends that Eleazer has failed to establish a prima facie case of discrimination or disparate treatment because she was not replaced by someone outside of her protected class—Black employees—nor can she show that other similarly situated employees outside of her protected class were treated more favorably. (Mot. Summ. J., Dkt. 14, at 10–14). The parties did not provide arguments as to whether Eleazer meets the other elements of a prima facie case of discrimination or disparate treatment, but the Court assumes without deciding that she does because she is Black, was qualified for the position, and was terminated from her position.

The parties agree that Eleazer was not directly replaced by someone of another race. (Mot. Summ. J., Dkt. 14, at 11; Resp., Dkt. 15, at 3). Eleazer, however, argues that she was treated differently than similarly situated employees. (*Id.* at 3–8). The "similarly situated" prong of establishing a prima facie case of discrimination or disparate treatment requires that the plaintiff

9

identify a fellow employee as a "comparator" who was outside of the plaintiff's protected group and was treated more favorably "under nearly identical circumstances." *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009) (quoting *Little v. Republic Ref. Co., Ltd.*, 924 F.2d 93, 97 (5th Cir. 1991)). "The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories. And, critically, the plaintiff's conduct that drew the adverse employment decision must have been nearly identical to that of the proffered comparator who allegedly drew dissimilar employment decisions. If the difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts for* the difference in treatment received from the employer, the employees are not similarly situated for the purposes of an employment discrimination analysis." *Id.* (emphasis in original) (citations omitted).

Eleazer was the only Black employee on her team. (Miller Dep., Dkt. 15-2, at 9:25–10:4). Eleazer alleges that "Miller and Levitt belittled her; Miller would ask Ms. Eleazer for proof or ask other people to verify basic facts that she told him; Miller changed numbers on her sales deals without telling her; he pestered her about completing work when she was out sick; and he micromanaged her." (Resp., Dkt. 15, at 3). Eleazer contends that she was "the only employee on her team whose performance was extensively documented," "was the only [employee] on her team disciplined for performance," and that her "performance was typical for members of her team." (*Id.* at 4). Eleazer also alleges she was the "only employee on her team falsely accused of having field representatives do all their work." (*Id.* at 6).[2]

---

[2] To rebut Miller's assertion that Oracle's "field teams" were leading "most, if not all, of [Eleazer's] accounts," (Resp., Dkt. 15-2, at 78:21–24), Eleazer submits two notes, which appear to have been produced in discovery, from field representatives sharing their positive impressions of their time working with Eleazer. (Resp., Dkts. 15-10, 15-11). Oracle asserts that these notes are "unsworn, unauthenticated, and constitute admissible

Eleazer has not presented competent summary judgment evidence of a team member of hers that exhibited "nearly identical" conduct to her own. *Lee*, 574 F.3d at 260. The evidence presented does not reveal that Eleazer had a team member with nearly identical achieved sales attainment and sales pipeline generation percentages. (Miller Dec., Dkt. 14-2, at ¶ 14; Resp., Dkts. 15-5, 15-6, 15-7, 15-8). The parties differ in how they represent Eleazer's achieved quarterly sales attainment percentages, although they agree that some of Eleazer's team members were not high performers either. (Mot. Summ. J., Dkt. 14, at 11; Resp., Dkt. 15, at 4–5). It is undisputed, however, that Eleazer ranked lowest among her team members in terms of hitting Oracle's sales attainment quota in Fiscal Year 2023.[3] (Miller Dec., Dkt. 14-2, at ¶ 14; Resp., Dkt. 15-8). Eleazer does not reference her achieved sales pipeline generation percentages for Fiscal Year 2023 in her response to Oracle's motion. The evidence in the record reveals that her achieved percentages were repeatedly lower than her team members' throughout the year. (Miller Dec., Dkt. 14-2, at ¶ 14).

There is also no competent summary judgment evidence of Miller or other Oracle employees observing that Eleazer's team members exhibited conduct identical to Eleazer's. Eleazer has not presented evidence that any of her team members—particularly those with achieved quota percentages closer to hers—had "essentially comparable violation histories" to hers.[4] *Lee*, 574 F.3d

---

hearsay" and therefore are not competent summary judgment evidence. (Reply, Dkt. 16, at 8). Assuming without deciding that these notes could constitute admissible evidence at trial, the notes do not contain evidence of a similarly situated comparator and therefore are irrelevant to the present analysis.

[3] Eleazer submits an excerpt of "deleted" Slack messages she contends shows that Levitt and Choi "scheme[d] about how to find a metric in which they [could] say Ms. Eleazer's performance [was] lowest" (Resp., Dkt. 15, at 6; Resp., Dkt. 15-19, at 2). In their reply, Oracle submits messages prior to and following those in Eleazer's excerpt in which Levitt and Choi discuss issues raised on a call they held with Eleazer to discuss her performance and rebuts Eleazer's assertion that Levitt and Choi deleted the messages. (Reply, Dkt. 16, at 7). Oracle asserts the "deletions occurred as a result of Oracle's system automatically deleting messages after a certain period of time. (*Id.*).

[4] Eleazer contends that she was the "only employee for which Miller kept a massive spreadsheet of gripes about how and when she performed data entry tasks" and that Miller "falsely claims" that he kept a spreadsheet of this kind for all employees on his team. (Resp., Dkt. 15, at 4). Eleazer states that Oracle did not identify any of those spreadsheets during discovery. (*Id.*). Oracle responds that these additional logs could not be produced because Miller deleted the spreadsheet with performance logs for his team in Fiscal Year

11

at 260. The parties each point to the example of another ASR in Eleazer's Sales Area who was put on a PIP and terminated on the same timeline as Eleazer. (Levitt Dec., Dkt. 14-3, at ¶ 13; *Id.* at 18; Choi Dec., Dkt. 14-4, at ¶ 8; Resp., Dkt. 15, 7–8). That ASR was Hispanic, and Oracle contends they were "exhibiting nearly identical performance deficiencies as Eleazer," citing their failures to meet their sales attainment and pipeline generation quotas in Fiscal Year 2023. (Mot. Summ. J., Dkt. 14, at 9). Oracle asserts the Hispanic ASR "also failed to show significant improvement against the PIP, and was likewise terminated effective May 23, 2023 (approximately one week before Ms. Eleazer's termination)." (*Id.*). This ASR was also supervised by Levitt—but not by Miller—and Choi was "directly involved" in the decision-making around their termination. (*Id.*). The parties argue about the significance of and meaning behind Oracle's termination of the Hispanic ASR. To establish her prima facie case, however, Eleazer must show that other similarly situated employees outside of her protected class were treated *more* favorably. *Standley*, 680 F. App'x at 327 (emphasis added). The Hispanic ASR appears to have been treated *similarly* to Eleazer, as she was put on a PIP and terminated. Therefore, upon review of the evidence in the record, the Court finds that Eleazer has not presented specific facts sufficient to create a genuine dispute with Oracle's account that she was not treated less favorably than other similarly situated employees of another race.

Thus, the Court must grant summary judgment for Oracle on Eleazer's discrimination claim, as she has not met the fourth element of a prima facie case for discrimination or disparate treatment. Because the evidence provides that Eleazer has not established a prima facie case, the Court will not reach the parties' arguments as to the second and third steps of the *McDonnell Douglas* burden-shifting framework.

---

2023 as part of the process of receiving a new work laptop, and because Miller only retained two of his previous supervisees after a "significant reorganization" at Oracle. (Reply, Dkt. 16, at 6). Oracle could, however, produce Eleazer's performance log because Miller had shared it with Human Resources during the PIP process. (*Id.*).

**C. Retaliation**

Oracle also moves for summary judgment on Eleazer's retaliation claims because she failed to exhaust her administrative remedies. (Mot. Summ. J., Dkt. 14, at 18). Exhaustion under Title VII occurs when an individual files a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), the charge is dismissed by the EEOC, and the EEOC informs the individual of the right to sue. *Hall v. Cont'l Airlines, Inc.*, 252 F. App'x. 650, 653 (5th Cir. 2007); 42 U.S.C. § 2000e-5(e) and (f). "[A] charge is sufficient when the [EEOC] receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of." 29 C.F.R. § 1601.12(b).

In assessing the sufficiency of a charge, the Fifth Circuit has noted two dueling principles: "(1) [c]onsistent with the remedial purposes underlying Title VII, we construe employment discrimination charges with the utmost liberality, bearing in mind that such charges are generally prepared by laymen untutored in the rules of pleading, and (2) the charge must contain an adequate factual basis so that it puts the employer on notice of the existence and nature of the charges and so the EEOC may have an opportunity to attempt to obtain voluntary compliance." *Preston v. Texas Dep't of Family & Protective Servs.*, 222 F. App'x 353, 356–57 (5th Cir. 2007). In balancing these considerations, the Fifth Circuit allows Title VII suits "based, not only upon the specific complaints made by the employee's initial EEOC charge, but also upon any kind of discrimination like or related to the charge's allegations, limited only by the scope of the EEOC investigation that could reasonably be expected to grow out of the initial charges of discrimination." *Id.* at 357.

Eleazer filed a charge of discrimination with the EEOC and the Texas Workforce Commission Civil Rights Division. (Smith Dec., Dkt. 14-5, at 18). Eleazer checked only the box for "Race" where she was given an option to check certain boxes in response to the prompt "DISCRIMINATION BASED ON." (*Id.*). Eleazer did not check the box marked "Retaliation."

13

(*Id.*). A Title VII plaintiff is not required to "check a certain box or recite a specific incantation to exhaust his or her administrative remedies," rather, "the plaintiff's administrative charge will be read somewhat broadly, in a fact-specific inquiry into what EEOC investigations it can reasonably be expected to trigger." *Pacheco v. Mineta*, 448 F.3d 783, 792 (5th Cir. 2006). Although Eleazer states in the particulars of her charge that Levitt and Choi were "aware of the treatment" she was experiencing from Miller, Eleazer does not allege any facts that she made a report of discrimination or engaged in another activity protected by Title VII. (*Id.* at 19). Because Eleazer did not allege having taken any actions that would have provoked retaliation, a retaliation claim cannot have been "reasonably be expected to grow out of" Eleazer's charge of race discrimination. *Preston*, 222 F. App'x at 357.

In response to Oracle's motion, Eleazer points to her EEOC "Inquiry Information" form ("inquiry form") in which she wrote under "Reason for Complaint:" "Race, Sex (including pregnancy, sexual orientation and gender identity), Retaliation - I complained to my employer about job discrimination." (Resp., Dkt. 15-14, at 1–2). Eleazer's inquiry form cannot be properly considered as a charge under EEOC Regulation 29 C.F.R. § 1601.9—which states that "[a] charge shall be in writing and signed and shall be verified"—such that Oracle would be on notice of Eleazer's claims or an EEOC investigation "could reasonably be expected to grow out of" it. *Preston*, 222 F. App'x at 357. There is no indication on Eleazer's inquiry form that it is either signed or verified. The EEOC regulation at issue defines "verified" as "sworn to or affirmed before a notary public, designated representative of the Commission, or other person duly authorized by law to administer oaths and take acknowledgements, or supported by an unsworn declaration in writing under penalty of perjury." 29 C.F.R. § 1601.3. "An intake questionnaire that 'is not verified as required by EEOC regulations . . . cannot be deemed a charge.'" *Ernst v. Methodist Hosp. Sys.*, 1 F.4th 333, 338 (5th Cir. 2021) (quoting *Patton v. Jacobs Eng'g Grp., Inc.*, 874 F.3d 437, 443 (5th Cir. 2017)).

An employment discrimination charge crucially puts employers on notice of the existence and nature of charges against them. "That rationale for the charge requirement is important because, in addition to promoting fairness for the employer, it gives the EEOC the opportunity to investigate and facilitate potential conciliation before lawsuits ensue." *Ernst v. Methodist Hosp. Sys.*, 1 F.4th 333, 339 (5th Cir. 2021).

Eleazer's failure to include an allegation of retaliation in her EEOC charge renders her retaliation claims unexhausted and outside the jurisdiction of this court. *See Mitchell v. U T L X Mfg., L.L.C.,* 569 F. App'x 228, 231 (5th Cir. 2014). Thus, the Court must grant summary judgment for Oracle on Eleazer's retaliation claims.

## IV. CONCLUSION

For the reasons stated above, **IT IS ORDERED** that Oracle's Motion for Summary Judgment, (Dkt. 14), is **GRANTED**. Oracle is entitled to summary judgment as to all of Eleazer's claims against it. **IT IS FURTHER ORDERED** that Eleazer's claims against Oracle are **DISMISSED**.

Final judgment will be entered in a separate order.

**SIGNED** on October 24, 2025.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE